[Cite as *State v. Cope*, 2018-Ohio-2479.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

DAVID J. COPE,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 17 CO 0005**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2015-CR-471

**BEFORE:**
Gene Donofrio, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Megan Bickerton, Columbiana County Prosecutor's Office, 38832 Saltwell Road, Lisbon, Ohio 44432*, for Plaintiff-Appellee.
*Atty. Nikki Baszynski*, Office of the Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for Defendant-Appellant.

**Dated:**
June 25, 2018

**Donofrio, J.**

{¶1}   Defendant-appellant, David Cope, appeals from a Columbiana County Common Pleas Court judgment convicting him of one count of illegal assembly or possession of chemicals for the manufacture of drugs, one count of endangering children, and three counts of possession of drugs, following a jury trial.

{¶2}   In the morning of August 6, 2015, the Columbiana County Drug Task Force (task force) executed a search warrant at appellant's home on suspicions of drug activity.  Appellant was at work at the time.  But three individuals who were staying at his house, Ron Lacey, Jessica Rudish, and Courtney Wilson, were present. Additionally, appellant's ten-year old son was in the house.  Police found a methamphetamine lab in the basement and drugs and drug paraphernalia throughout the house, including in appellant's bedroom.

{¶3}   A Columbiana County Grand Jury subsequently indicted appellant on one count of illegal assembly or possession of chemicals for the manufacture of drugs, a second-degree felony in violation of R.C. 2925.041(A); one count of endangering children, a third-degree felony in violation of R.C. 2919.22(B)(6); one count of possession of drugs (possession of cocaine, less than five grams), a fifth-degree felony in violation of R.C. 2925.11(A); one count of possession of drugs (possession of methamphetamine, less than the bulk amount), a fifth-degree felony in violation of R.C. 2925.11(A); and one count of possession of drugs (Nandrolone Decanoate, less than the bulk amount), a first-degree misdemeanor in violation of R.C. 2925.11(A).

{¶4}   The case proceeded to a jury trial.  Appellant contended throughout the trial that Lacey was the person who was responsible for the meth lab in the basement and he was unaware of the drug activity taking place in his own house.  Appellant denied that any of the drugs or paraphernalia belonged to him.  The jury found appellant guilty on all counts.

{¶5}   The trial court subsequently set the matter for a sentencing hearing.  The court sentenced appellant to four years on the count of illegal assembly or possession of chemicals for the manufacture of drugs, two years on the count of endangering children, and six months on each of the three drug possession counts.  The court

ordered the first two sentences to be served consecutively and the remaining sentences to be served concurrently, for a total sentence of six years in prison.

**{¶6}** Appellant filed a timely notice of appeal on February 23, 2017. He now raises a single assignment of error.

**{¶7}** Appellant's sole assignment of error states:

DAVID J. COPE'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶8}** Appellant argues his convictions were against the manifest weight of the evidence. He notes that although the drugs were found in his home, he was not home at the time. He points out that Rudish was the only person who connected him to the drugs, and she too was charged with various drug offenses. He claims she had a motive to implicate him because if she did not testify that the drugs in the bedroom were appellant's then she would be responsible for them. Appellant urges it is significant that the state did not call the other two people in the house at the time of the drug raid as witnesses. He claims their absence at his trial speaks to his lack of involvement and Rudish's lack of credibility. Moreover, appellant points to the testimony of the defense witnesses who testified that he was a good father and respectable employee. Finally, appellant points to his testimony that he was unaware that Lacey was manufacturing methamphetamine in his basement. He states that the fact that drugs were present in his home was not enough evidence to establish they were his drugs.

**{¶9}** In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most

favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶10} Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶ 49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

{¶11} In order to reverse a jury verdict as against the manifest weight of the evidence, all three appellate judges must concur. *Thompkins*, 778 Ohio St.3d at 389.

{¶12} The jury convicted appellant of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.041(A), which provides:

> No person shall knowingly assemble or possess one or more chemicals
> that may be used to manufacture a controlled substance in schedule I or II
> with the intent to manufacture a controlled substance in schedule I or II in
> violation of section 2925.04 of the Revised Code.

{¶13} Methamphetamine is a schedule II controlled substance. R.C. 3719.41(C)(2).

{¶14} The jury also convicted appellant of endangering children in violation of R.C. 2919.22(B)(6), which provides that no person shall allow a child under 18 years of age "to be on the same parcel of real property and within one hundred feet of, * * * any act in violation of section 2925.04 or 2925.041 of the Revised Code when the person knows that the act is occurring[.]"

{¶15} And the jury convicted appellant of three counts of possession of drugs in violation of R.C. 2925.11, which provides: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." One count was for possession of cocaine in an amount less than five grams. One count was for possession of methamphetamine in an amount less than the bulk amount. And the final count was for possession of Nandrolone Decanoate (a steroid) in an amount less than the bulk amount.

{¶16} We must examine the evidence put forth at trial to determine if the jury's verdict on these counts was against the manifest weight of the evidence.

{¶17} The state presented five witnesses.

{¶18} Detective Brett Grabman, an undercover narcotics detective for the task force, was the state's first witness. Det. Grabman obtained a search warrant for appellant's home. (Tr. 109). He testified that the task force entered appellant's home through an unlocked sliding-glass door at 8:30 a.m. (Tr. 111). Appellant was not home. (Tr. 120). But the task force located Lacey and Wilson lying on a concrete floor in a mudroom, Rudish in appellant's bedroom, and appellant's ten-year-old son in his own bedroom. (Tr. 112-113). The task force took everyone outside and began to search the house. (Tr. 113-114).

{¶19} Det. Grabman testified that the basement was only accessible by way of a padlocked door outside of the residence. (Tr. 114). He stated that they had to force the door open. (Tr. 114). Upon entering the basement, Det. Grabman was overwhelmed by the odor of chemicals. (Tr. 114). He evacuated the basement and called the fire department based on his suspicion of a meth lab. (Tr. 114-115). Upon investigation, Det. Grabman found four items related to the manufacture of methamphetamine in the basement. (Tr. 116). He found a gallon jug of muriatic acid; a Mountain Dew bottle with a tube coming out of it, which he considered to be an acid gas generator; a water pack; and another plastic bottle that was a "one-pot" meth lab. (Tr. 117). The one-pot meth lab tested positive for over 17 grams of methamphetamine. (Tr. 142).

{¶20} Det. Grabman also noticed two fire pits in appellant's yard. (Tr. 125, 127). He testified that whenever the task force is investigating a possible meth lab, they look for the possibility of destruction of evidence, which frequently entails some sort of fire

pit. (Tr. 125). Inside of the fire pits, Det. Grabman found cut-open batteries. (Tr. 126, 127). He testified that lithium is a main ingredient in manufacturing methamphetamine and lithium is most commonly found in batteries. (Tr. 126).

**{¶21}** In the mudroom where Lacey and Wilson were located, the task force found a digital scale with residue that tested positive for meth, a possible meth pipe, a syringe, and a spoon. (Tr. 129-130, 141). In appellant's master bedroom, the task force found appellant's mail and personal belongings. (Tr. 132). The task force also found a purple lunch box containing syringes, a plate, and a meth pipe. (Tr. 132). The task force also located a digital scale, a syringe with liquid in it, straws, and a glass plate with a white substance and a white rock on it. (Tr. 133). The substance on the glass plate tested positive for cocaine. (Tr. 151). The liquid in the syringe tested positive for steroids. (Tr. 152-153). The residue in one of the straws tested positive for methamphetamine. (Tr. 153).

**{¶22}** On cross-examination, Det. Grabman admitted that in executing the search warrant he was not specifically looking for appellant. (Tr. 161). He stated that throughout his investigation, Lacey was the primary suspect. (Tr. 166).

**{¶23}** Lieutenant Brian McLaughlin, the director of the task force, testified next. He corroborated some of Det. Grabman's testimony and described the meth manufacturing process for the jury. Lt. McLaughlin also testified that the meth odor was not present in the main living area of the home. (Tr. 185).

**{¶24}** The state's third witness was Whitney Voss, the forensic scientist at the Ohio Bureau of Criminal Identification and Investigation who tested the items from appellant's house for controlled substances. Voss testified that the plate from appellant's bedroom contained .07 grams of cocaine. (Tr. 196-197). She testified that the liquid retrieved from the syringe in appellant's bedroom was 1.18 grams of a steroid known as Nandrolone Decanoate. (Tr. 197-200). And she testified that the straw from appellant's bedroom contained methamphetamine residue. (Tr. 201-202). Additionally, Voss testified that the one-pot meth lab contained 17.96 grams of methamphetamine. (Tr. 205-206).

**{¶25}** Detective-Sergeant Steven Walker, the task force member who conducted the search of appellant's bedroom, was the state's fourth witness. He testified that he

Case No. 17 CO 0005

located that plate with the cocaine near appellant's bed. (Tr. 217-218). He located the digital scale nearby. (Tr. 218-219). He also located a glass smoking device, several straws, and a syringe with liquid in it in appellant's bedroom. (Tr. 219-220). Additionally, Det.-Sgt. Walker testified that he found an Ohio Edison bill with appellant's name and address on it that had been rolled up into a straw and had a white powdery substance on it. (Tr. 224).

{¶26} On cross examination, Det.-Sgt. Walker stated that he did not smell anything out of the ordinary in the main living area of the house. (Tr. 228).

{¶27} Jessica Rudish was the state's final witness. Rudish testified that she first met appellant approximately five to six months prior to the raid. (Tr. 234). A mutual friend had brought her to appellant's home to get high. (Tr. 235-236). That day, she used meth in appellant's bathroom with appellant. (Tr. 236-237). Rudish testified that over the next few months, she developed a sexual relationship with appellant as well as a drug-related relationship. (Tr. 238). She stated that they used drugs together and meth was their drug of choice. (Tr. 238). Rudish testified that usually appellant would snort the meth and she would inject it. (Tr. 238). Rudish testified that sometimes when they used meth at appellant's house, his son was there. (Tr. 241). Rudish testified either she, appellant, or Lacey would provide the meth for their use. (Tr. 239). When asked if she knew that meth was being made in appellant's basement, Rudish replied "[p]retty much anyone that went to the house knew what was going on." (Tr. 241).

{¶28} Rudish stated that she would usually stay at appellant's house using drugs for three to seven days at a time. (Tr. 243). On the day of the raid, Rudish had been staying at appellant's house for several days. Additionally, Courtney Wilson had been there for about three days. (Tr. 248). And Lacey was living there. (Tr. 239-240). Rudish stated that appellant's son interacted with all of them. (Tr. 249). Rudish stated that on the day of the raid, appellant had asked her to watch his son while he went to work. (Tr. 250-251).

{¶29} Rudish further testified that during her relationship with appellant, they had gone into his basement together to get high. (Tr. 255-256). She stated she eventually learned that Lacey was manufacturing meth in appellant's basement and that appellant knew this was going on too. (Tr. 256). Rudish testified that Lacey provided both her

and appellant with the meth that he made. (Tr. 257). She also testified that Lacey was the only person she ever saw actually making the meth. (Tr. 276).

{¶30} Appellant called four witnesses. He also took the stand in his defense.

{¶31} First, appellant called Sean Campbell, the general manager of the business where appellant worked. Campbell testified that appellant is a good employee. (Tr. 280). He stated he had no concerns with appellant's attendance. (Tr. 281). Finally, Campbell stated that he has never had any concerns with appellant that would have caused him to request that appellant be drug-tested. (Tr. 282).

{¶32} Next, appellant called Jacob Snyder. Snyder testified that he used to have a drug problem. (Tr. 299). He stated that he would go to appellant's house to pick up Lacey so that they could go purchase heroin. (Tr. 300-302). He stated that for a period of time, he went to appellant's house to meet Lacey on a daily basis. (Tr. 301). Snyder testified that appellant was never there and the heroin was not at his house. (Tr. 301).

{¶33} Appellant's third witness was James Hiner, appellant's supervisor. He characterized appellant as hard-working and stated appellant came to work every day. (Tr. 319).

{¶34} Raymond Rowe, appellant's co-worker and friend, was appellant's fourth witness. Rowe testified that he spent a lot of time with appellant both at work and socially. (Tr. 326-327). He did not have any concerns about appellant around the time of the drug raid. (Tr. 327). Rowe also testified that appellant was a good father. (Tr. 327).

{¶35} Finally, appellant testified. Appellant stated that he had gone to school with Lacey 20 years ago. (Tr. 339). In 2015, appellant became reacquainted with Lacey when a mutual friend brought Lacey to his house. (Tr. 340). Lacey needed a place to stay, so appellant told him he could stay at his house. (Tr. 340, 341). Appellant stated he did not spend a lot of time with Lacey because he went to work and then to his parents' house, which kept him away from home for 12-14 hours a day. (Tr. 341-342).

{¶36} Appellant stated that he met Rudish through Lacey. (Tr. 341). He described his relationship with her as "an acquaintance with benefits." (Tr. 340). He stated Rudish stayed at his house a few days a week. (Tr. 344).

{¶37} Appellant testified that he did not know Lacey or Rudish to use drugs. (Tr. 344). He stated that they never did drugs in front of him. (Tr. 345). Nor did he know Courtney Wilson to use drugs. (Tr. 346). Appellant testified that he had no idea there was drug activity going on in his house. (Tr. 347). He claimed it must have occurred while he was at work. (Tr. 347). Appellant stated that he only went into his basement about once a month. (Tr. 353).

{¶38} Appellant denied knowing how to make meth and denied ever using meth. (Tr. 348). He testified that he would not allow drug use in his house. (Tr. 348-349). He stated he had no knowledge of the drug activity occurring in his house until it was raided. (Tr. 349).

{¶39} Appellant testified that usually he dropped his son off with his parents when he went to work. (Tr. 350). But on the day of the raid, his parents were unavailable so Lacey agreed to watch him. (Tr. 350). He stated that when he left for work, Lacey, Rudish, and Wilson were all in his kitchen. (Tr. 363). Appellant denied knowing that there was a plate with cocaine, straws containing meth, a glass pipe, and digital scale in his bedroom that morning. (Tr. 373). He testified that he had slept in his room the previous night. (Tr. 373).

{¶40} Considering this evidence, we cannot conclude that the jury lost its way in finding appellant guilty.

{¶41} There was no dispute that a methamphetamine lab was found in appellant's basement along with supplies to manufacture methamphetamine. There was also no dispute that a plate containing cocaine, a straw containing meth residue, and a syringe filled with a steroid were found in appellant's bedroom where he had slept the night before. And there was no dispute that appellant left for work and entrusted his ten-year-old son in Lacey's and Rudish's care. The dispute here is whether the drugs belonged to appellant and whether appellant knew of the drug manufacturing occurring in his basement.

**{¶42}** Appellant argues that the state did not prove that the drugs found in his home belonged to him.

**{¶43}** "Possession" is "having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). But possession can be either actual or constructive. "To establish constructive possession, the state must prove that the defendant was conscious of the object, and able to exercise dominion or control over it even though that object may not be within his immediate physical possession." *State v. St. John*, 7th Dist. No. 09 BE 13, 2009-Ohio-6248, ¶ 19, citing *State v. Hankerson*, 70 Ohio St.2d 87, 90-91, 434 N.E.2d 1362 (1982).

**{¶44}** As to the possession counts, the evidence was that drugs were located in appellant's bedroom the morning after he had just slept there. Appellant's electric bill was rolled into a straw and was located in close proximity to the drugs. And Rudish testified that she and appellant frequently used meth together. Appellant testified that he knew nothing about the drugs in his bedroom. This was a matter of credibility. The jury was in the best position to judge the witnesses' credibility and conflicting testimony. *Rouse*, 2005–Ohio–6328, at ¶ 49, citing *Hill*, 75 Ohio St.3d at 205. That is because the jurors could observe witnesses' gestures, voice inflections, and demeanor. *Id.* We will not second-guess the jury's determinations of credibility. The jury was free to determine that Rudish's testimony was more credible than appellant's testimony.

**{¶45}** As to the illegal assembly or possession of chemicals for the manufacture of drugs, the evidence was that a meth lab was located in appellant's basement along with various supplies to manufacture methamphetamine. Additionally, two burn piles were located in appellant's yard containing cut-open batteries. Det. Grabman testified that lithium inside batteries was used to manufacture meth. Moreover, Rudish testified that she had been in appellant's basement with appellant to get high and that they both knew there was a meth lab in the basement.

**{¶46}** Finally, as to the endangering children, the evidence was that appellant allowed his ten-year-old son to live in the same house where, according to Rudish, he knew methamphetamine was being produced.

**{¶47}** Appellant argues Rudish's testimony was not credible because she had a motive to implicate him to cast blame away from her. But Rudish openly testified as to her own drug use and admitted to using drugs in appellant's home. Moreover, as stated above, the jury was in the best position to judge Rudish's testimony.

**{¶48}** Appellant also contends it is significant that the state did not call Lacey and Wilson as witnesses. He argues their absence demonstrates Rudish's testimony was not credible. But "the failure of the prosecution to call a witness does not give rise to an inference that the witness' testimony would have been favorable to the accused." *State v. Bowen*, 7th Dist. No. 96 CO 68, 1999 WL 1138583 (Dec. 8, 1999), citing *State v. Daugherty*, 26 Ohio App.2d 159, 163-164, 269 N.E.2d 849 (4th Dist.1971).

**{¶49}** Finally, appellant points to the testimony of the witnesses who testified that he was a good father and respectable employee. While this character evidence attempted to cast appellant in a good light, it did not rebut the evidence that was found at his home. It was within the jury's judgment to determine how to weigh the character evidence against the rest of the evidence they heard.

**{¶50}** In sum, appellant's convictions are supported by the manifest weight of the evidence.

**{¶51}** Accordingly, appellant's sole assignment of error is without merit and is overruled.

**{¶52}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs
Robb, P. J., concurs

Case No. 17 CO 0005

_____

For the reasons stated in the Opinion rendered herein, the sole assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**
**This document constitutes a final judgment entry.**